**IN THE UNITED STATED DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANDREW BOODOO,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No.:**  2:24-cv-451 |
| | : | |
| **ON-SITE COMPANIONSHIP** | : | |
| **SERVICES, INC.; and DR. DERRICK** | : | |
| **POLLOCK,** *jointly and severally*, | : | |
| | : | |
| **Defendants.** | | |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff, Andrew Boodoo, by and through the undersigned counsel,

J.P. Ward & Associates, LLC, and, specifically, Joshua P. Ward, Esquire, who files the within

Complaint in Civil Action, against Defendants, On-Site Companionship Services, Inc. and Dr.

Derrick Pollock, jointly and severally, and in support thereof states as follows:

## PARTIES

1.      Plaintiff, Andrew Boodoo (hereinafter "Mr. Boodoo"), is an adult individual who

currently resides at 68 Marwood Avenue, Unit B, Pittsburgh, PA 15221.

2.      Defendant, On-Site Companionship Services, Inc. (hereinafter "On-Site"), is a

domestic business corporation with a principal place of business at 429 4th Avenue, Pittsburgh,

PA 15219.

3.      Defendant, Dr. Derrick Pollock (hereinafter "Dr. Pollock"), is an adult individual

who upon information and belief, currently resides in Allegheny County.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper as Plaintiff brings this lawsuit under the The False Claims Act ("FCA" – 31 U.S.C. §§ 3729 *et seq.*), Pennsylvania Adult Protective Services Act ("APSA" – 35 P.S. § 10210, *et. seq.*) and Pennsylvania common law Wrongful Termination.

5.      Venue is proper pursuant to Pa.R.C.P. 2179(a)(2) because Defendant conducts business in Allegheny County, Pennsylvania.

## FACTUAL ALLEGATIONS

6.      Mr. Boodoo began his employment with Respondents on December 1, 2022, as a Site Supervisor.

7.      On-Site is a health care and social assistance service providing residential services for adults.  Their marketing materials on Linkdin.com states, in relevant part, "On-Site Companionship Services, Inc., (OCS) is a private for profit, community-based human services agency serving the citizens and communities of Western Pennsylvania. Our agency was founded in 2018 in response to the Pennsylvania Mental Health and Mental Retardation Act of 1966."

8.      Upon information and belief, On-Site has over 100 employees.

9.      Upon information and belief, On-Site obtains its client referrals through the Pennsylvania Department of Human Services and The Office of Developmental Programs (ODP), which refers and manages cases for clients that have intellectual disabilities.

10.     Upon information and belief, On-Site utilizes two pieces of software, "MITC" and "CREW", to manage time-keeping and billing submitted to the Centers for Medicare a & Medicaid Services.

2

11.     Mr. Boodoo's responsibilities as a Site Supervisor included, but were not limited to, assisting residents, fixing medications, and talking to therapists.

12.     In March 2023, Mr. Boodoo was presented with an award for Employee of the Month in recognition for his dedication, passion, and hard work.

13.     On or about April or May 2023, there was an internal dispute in Respondents' company and the personnel structure changed.

   **a.  Mr. Boodoo reports sexual wrongdoing on behalf of Respondents' employees.**

14.     On or around July 2023, Mr. Boodoo made a complaint to Human Resource Representative, Alexis Sherwood (hereinafter "Ms. Sherwood"), that she kept making scheduling errors.

15.     Following his complaint, Ms. Sherwood began decreasing the number of hours that Mr. Boodoo scheduled for each week.

16.     Subsequently, Mr. Boodoo notified the owner, Dr. Pollock, that Ms. Sherwood decreasing his hours and making errors regarding payroll, however, Dr. Pollock did not take action to rectify the situation.

17.     Around the same time, Mr. Boodoo reported to Mr. Pollock that one of his coworkers, Sam Blair (hereinafter "Mr. Blair"), was having a sexual relationship with one of the adult clients that had intellectual disabilities, including, autism, mood disorders, and intermittent explosive disorder.   This client was referred through ODP and had a monthly Individual Support Plan (hereinafter "ISP"),

18.     Upon information and belief, Respondents never took any corrective action against Mr. Blair. In fact, Respondents increased Mr. Blair's hours from two days per week to five days per week following Mr. Boodoo's report.

### b.  Mr. Boodoo's Reports about Staff Selling Drugs to Clients

19.     On August 28, 2023, Mr. Boodoo was working an overnight shift taking care of a client, M.L.  (full name not given for confidentiality purposes), who has his own apartment.

20.     M.L.  was allowed up to four (4) hours of alone time as part of his Individual Support Plan (hereinafter "ISP"), which is a plan that details what is most important to the care of an individual with an intellectual disability. Therefore, it was common practice for Respondents' staff to leave the house when M.L.  requested alone time.

21.     M.L.  frequently had members of On-Site's staff sell or buy drugs from him.

22.     Around 12:00 am, M.L.  asked Mr. Boodoo to roll a marijuana joint for him to smoke, or alternatively to acquire marijuana from other employees. However, Mr. Boodoo refused.

23.     Thereafter, M.L.  became very agitated and requested alone time.

24.     Acting in accordance with B.'s ISP and On-Site's practices, Mr. Boodoo left M.L.'s home and called the On-Call Manager, Jamar Jackson (hereinafter "Mr. Jackson"), to inform him.

25.     However, Mr. Jackson did not answer his phone and Mr. Boodoo was forced to leave two voicemails.

26.     Mr. Jackson did not call Mr. Boodoo back until 3:00 am, at which point Mr. Boodoo informed him that he was changing his clothes and would return to M.L.'s house well within the allotted four hours.

4

27.     However, when Mr. Boodoo was returning to M.L. 's home, he passed Mr. Jackson, who had just left the residence. When he attempted to enter the residence, he found that the front door was locked and that he could not enter because he did not have a key.

28.     Mr. Boodoo once again attempted to call Mr. Jackson, who never answered and Mr. Boodoo was unable to gain entrance for the remainder of his shift. Upon information and belief, Mr. Jackson purposefully locked Mr. Boodoo out of the residence.

29.     A couple of days later, Mr. Boodoo received an email from Ms. Sherwood, who informed him that he was being written up for abandoning M.L.  on August 28, 2023 without contacting Respondents. The email also stated that Respondents have a "zero tolerance policy" for leaving clients unattended.

30.     In response, Mr. Boodoo stated that M.L.  requested alone time after Mr. Boodoo refused to roll his drugs for him or contact any other staff to pick up drugs for him. Mr. Boodoo also stated that it is unacceptable for Respondents to knowingly allow this situation to occur, especially when M.L.  did not have his medical marijuana license.

31.     Mr. Boodoo also reported that he was being treated differently as Respondents were picking and choosing what specific incidents to discipline staff for, while ignoring Mr. Boodoo's reports of illegal activity and violations of state policies.

32.     Further, Mr. Boodoo complained that when he contacts Respondents they do not always respond in a timely manner.

33.     Therefore, Mr. Boodoo refused to sign or accept the write-up.

34.     Importantly, although Mr. Boodoo had made complaints about Respondents' staff engaging in illegal drug behavior specifically with M.L. , Respondents did not take any corrective against M.L.  or the offending staff.

35.     Instead, Dr. Pollock reached out to Mr. Boodoo to set up a meeting to discuss the write-up. Dr. Pollock informed Mr. Boodoo that he would be the one taking care of the matter and working towards a resolution. However, during the meeting, Mr. Boodoo once again explained the situation to Dr. Pollock and stated that he believed he would be neglecting M.L. if he had not acted in accordance with the ISP. However, Dr. Pollock stated that he would not be retracting the write-up.

### c.   Mr. Boodoo reports sexual harassment by Respondents' employee

36.     During the same meeting, Mr. Boodoo reported to Dr. Pollock that Mr. Jackson had initiated sexual relationships with some of the female employees, and had sent a picture of his genitalia to one of the female employees.

37.     Upon information and belief, Dr. Pollock took notes regarding Mr. Boodoo's report, but failed to take any corrective action towards Mr. Jackson.

### d.   Respondents' Retaliation Against Mr. Boodoo

38.     On September 23, 2023, Mr. Boodoo relieved his coworker, Tristan Pierce (hereinafter "Mr. Pierce"), in order to start his overnight shift at a client's house from 11:00pm to 7:00am.

39.     Mr. Boodoo clocked in at 10:38pm and clocked out at 8:00am, and worked the entirety of his shift at the client's house.

40.     On September 26, 2023, the Head of Human Resources, Amaris Andrade (hereinafter "Ms. Andrade"), emailed Mr. Boodoo to inform him that his employment was being terminated. Dr. Pollock was copied on the email.

41.     The email alleged that Mr. Boodoo was not present at the worksite for the entirety of his shift on September 23, 2023, and that Mr. Boodoo left a client unattended for an extended period.

42.     The email alleged that Mr. Boodoo was not seen on any of the surveillance cameras at the worksite. However, upon information and belief, the surveillance cameras at the worksite in question were not operational on the day of September 23, 2023.

43.     Additionally, the email cited Mr. Boodoo's previous write-up and claimed this was the second time that he had left a client unattended despite Mr. Boodoo's repeated explanations that he was acting in accordance with the client's ISP and reporting illegal activity by the client and staff.

44.     On-Site had paid Mr. Boodoo for working a full eight-hour shift on September 23, 2023.  Therefore, upon information and belief, Dr. Pollock fabricated the allegations that Mr. Boodoo had left a client unattended and terminated his employment in retaliation for his multiple reports of fraudulent billing, illegal conduct, and sexual misconduct, abuse and neglect, by Respondents, their staff, and their client.

### PARTICIPATION THEORY
*Plaintiff v. Defendants, both jointly and severally*
*(Pled in Connection with All Counts)*

45.     The Courts of this Commonwealth have long recognized the "participation theory", whereby, a corporate officer who participates in wrongful, injury-producing conduct can be personally liable, that is, individually liable for torts committed while acting within the scope of his or her employment by the corporation.  *Loeffler v. McShane*, 539 A.2d 876 (Pa. Super. 1988); *Moy v. Schreiber Deed Sec. Co.,* 535 A.2d 1186 (Pa. Super. 1988); *Amabile v. Auto Kleen*

*Car Wash*, 376 A.2d 247 (Pa. Super. 1977); *Tayar v. Camelback Corp. Inc*., 957 A.2d 281 (Pa. Super. 2008).

46.     Moreover, the fact that a corporation may be vicariously or secondarily liable under the doctrine of respondeat superior does not relieve the individual of his or her responsibility.  An action against such individual may exist even though the agent or officer derived no personal benefit, but acted on behalf of, and in the name of, the corporation and the corporation alone was enriched by the act.  *Shonberger v. Oswell*, 530 A.2d 112 (Pa. Super. 1987); *Kaites v. Com. of Pa. Dept. of Environmental Resources*, 529 A.2d 1148 (Pa. Commw. 1987).

47.     There is a distinction between liability for individual participation in a wrongful act and an individual's responsibility for any liability-creating act performed behind the veil of a sham corporation; when the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity and therefore its acts are truly the owner's, while under the participation theory, the court imposes liability on the individual as an actor rather than as an owner.  *Shay v. Flight C Helicopter Services, Inc*., 822 A.2d 1 (Pa. Super. 2003).

48.     Defendant Dr. Pollock is the owner of Defendant corporation.

49.     Dr. Pollock retaliated against and terminated Mr. Boodoo following his multiple complaints regarding illegal conduct and sexual misconduct by Defendants, their staff, and their clients in the workplace.

<u>**COUNT I**</u>
**RETALIATION IN VIOLATION OF
THE FALSE CLAIMS ACT**
*(Plaintiff v. all Defendants, jointly and severally)*

50. The False Claims Act provides, in pertinent part, that a person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment of approval;
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> (a)(1)(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G).
> …
>
> (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government…31 U.S.C. § 3729.

51.     The False Claims Act contains an anti-retaliation provision, which states: "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

52.     A *prima facie* claim under the retaliation provision requires a plaintiff to show that: (1) he engaged in "protected conduct," (i.e. acts done in furtherance of an action under § 3730) and (2) that he was discriminated against because of his "protected conduct." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176 (3d Cir. 2001) (*Citing United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998) (internal quotation omitted)).

53.     To prove discrimination "because of" conduct in furtherance of a False Claims Act suit, a plaintiff must show that (1) his employer had knowledge he was engaged in

"protected conduct"; and (2) that his employer's retaliation was motivated, at least in part, by the employee's engaging in "protected conduct." *Id.*; *See also, Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 914 (4th Cir. 1997).

54.    Defendants bill the United States for Medicaid and/or Medicare for its client services.

55.    Plaintiff engaged in protected activity by reporting that Defendants' staff member was having sexual relationships with a male client, and selling drugs to client(s), all whilst billing the federal government for services rendered.

56.    Plaintiff was retaliated against when he was fired from his job position following his reports.

57.    The retaliation was motivated, at least in part, by his reports of wrongdoing with a client for whom Defendants were billing the government.

58.    Defendants' actions were intentional, willful, wanton, callous, and done in reckless indifferent to the rights of others.

59.     As a direct and proximate result of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.


WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in Plaintiff's favor and against Defendants, jointly and severally, including back pay, front pay, compensatory and punitive damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

## COUNT II
### WRONGFUL TERMINATION
### IN VIOLATION OF THE ADULT PROTECTIVE SERVICES ACT
*(Plaintiff v. all Defendants, jointly and severally)*

60.    Mr. Boodoo incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

61.    In 2010, the Adult Protective Services Act (hereinafter "APSA") was enacted to protect adults between the ages of 18 and 59 with a physical or mental disability that limits one or more major life activities. The APSA establishes a program of protective services under the DHS in order to detect, prevent, reduce, and eliminate abuse, neglect, exploitation, and abandonment of these adults in need. Pa. Stat. Ann. tit. 35, § 10210.101 (West).

62.  It is declared the policy of this Commonwealth that:

> (1) Adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment must have access to services necessary to protect their health, safety and welfare.
> . . .
> (4) Information about protective services should be provided in a safe place and in a safe, understandable and responsive manner.
>
> (5) The Commonwealth must provide for the detection, prevention, reduction and elimination of abuse, neglect, exploitation and abandonment and establish a program of protective services for adults in need of them.

Pa. C.S. 35 § 10210.102 (West).

63.    Section 10210.501, Reporting by employees, subsection (a)(1), states that "An employee or an administrator who has reasonable cause to suspect that a recipient is a victim of abuse or neglect shall immediately make an oral report to an agency. If applicable, the agency shall advise the employee or administrator of additional reporting requirements that may pertain

under subsection (b). An employee shall notify the administrator immediately following the report to the agency." *Id*.

64.    The APSA functions as a direct extension of the PWL, as stated in its whistleblower provision, "A person required under this act to report a case of suspected abuse or neglect shall not be subject to any retaliatory action for reporting suspected abuse or neglect and shall have the protections and remedies set forth in the act of December 12, 1986 (P.L.1559, No.169), known as the Whistleblower Law." 35 P.S. § 10210.506.

65.    The APSA defines abuse as "the willful deprivation by a caregiver of goods or services which are necessary to maintain physical or mental health."  35 P.S. § 10210.103.

66.    The APSA defines neglect as "the failure to provide for oneself or the failure of a caregiver to provide goods, care or services essential to avoid a clear and serious threat to the physical or mental health of an adult." *Id.*

67.    Under the APSA, Plaintiff had an affirmative duty to report the abuse and neglect of an adult client in need to the appropriate authorities.  35 P.S. § 10210.501.

68.    Further, pursuant to Section 10210.302(a), "A person having reasonable cause to believe that an adult is in need of protective services may report such information to the agency."

69.    Section 302 expressly prohibits retaliation and intimidation against persons who make reports of suspected abuse and neglect. The Act contains provisions providing for a civil cause of action against persons who engage in retaliation and intimidation against reporters.

70.    Pursuant to Section 302, Reporting:

(d) Retaliatory action.-

> (1) Any person who makes a report or cooperates with the agency, including providing testimony in any administrative or judicial proceeding, and any adult in need of protective services shall not

be subject to any discriminatory, retaliatory or disciplinary action by an employer or by any other person or entity.

(2) Any person who violates this subsection is subject to a civil action by the reporter or the adult in need of protective services, in which action the reporter or adult in need of protective services shall recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater.

(e) Intimidation.-

(1) A person, including an adult in need of protective services, with knowledge sufficient to justify making a report or cooperating with an agency, including possibly providing testimony in an administrative or judicial proceeding, shall not be subject to any intimidation by an employer or by any other person or entity.

(2) A person who violates this subsection is subject to civil action by the reporter or the adult in need of protective services, in which action the reporter or adult in need of protective services shall recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater.

35  P.S. § 10210.302.

71.     Mr. Boodoo reported that one of On-Site's staff members was engaging in a sexual relationship with a client to Dr. Pollock. The sexual relationship amounted to abuse, as defined by the APSA.

72.     Mr. Boodoo also reported illegal drug use by one of Defendants' clients, as well as that Defendants' staff would sell, buy, and provide illegal drugs to Defendants' client and they were knowingly ignoring the problem.

73.     Defendants retaliated against Mr. Boodoo by issuing a write-up and subsequently terminating his employment under false pretenses.

74.     Defendants' actions were intentional, willful, wanton, callous, and done in reckless indifferent to the rights of others.

75.     As a direct and proximate result of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in Plaintiff's favor and against Defendants, jointly and severally, including back pay, front pay, compensatory and punitive damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

## COUNT II
### Common Law Wrongful Termination - Violation of a Clear Mandates of Commonwealth Public Policy Rated to Safety Complaints
*(Plaintiff v. all Defendants, jointly and severally)*

76.     In the Commonwealth of Pennsylvania, "as a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship." *Mikhail v. Pennsylvania Org. for Women in Early Recovery,* 63 A.3d 313, 316 (Pa. Super. 2013).

77.     However, an at-will employee "will be entitled to bring a cause of action for a termination of that relationship . . . where the termination implicates a clear mandate of public policy in the Commonwealth of Pennsylvania." *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 287 (Pa. 2000).

78.     Pennsylvania courts define public policy "by reference to the laws and legal precedents and not from supposed public interest." *Id*. at 288.

79.     It is well established that an employee that makes safety concerns in the workplace, and particularly when in a medical setting complaints are made internally and externally regarding abuse and neglect, can set forth a claim for wrongful termination.  See e.g.

*Tanay v. Encore Healthcare, LLC*, 810 F. Supp. 2d 734, 738–39 (E.D. Pa. 2011); *Wetherhold v. Radioshack Corp.*, 339 F. Supp. 2d 670, 682 (E.D. Pa. 2004).

A. **Plaintiff's termination violates the public policy found in the Health Care Facilities Act, 35 Pa. Stat. § 448.101 et seq., as implemented by 28 Pa.Code § 611.1 et seq., and the Adult Protective Services Act, 35 Pa. C.S.A. § 10210.101, et seq.**

80.     The Health Care Facilities Act, 35 Pa. Stat. § 448.101 et seq., as implemented by 28 Pa.Code § 611.1 et seq., sets forth the licensing requirements and minimum competency standards for Home Care Agencies and Home Care Registries.

81.     Defendant is licensed as a Home Care Agency, pursuant to 28 Pa. Code § 611.2 (c).

82.     The purpose of this Home Health Care Agency code is to "to protect and promote the public health and welfare through the establishment and enforcement of regulations setting minimum standards for the operation of home care agencies and home care registries. The standards are intended by the Department to assure safe, adequate and efficient home care agencies and home care registries, and to promote the health, safety and adequate care of the consumers of services provided by home care agencies and home care registries." 28 Pa. Code § 611.1 (c).

83.     Pursuant to Section 611.3 (b), Defendant must comply with the minimum standards, requirements, and public policy concerns set forth in the entirety of 28 Pa.Code § 601.1 et seq.

84.     Further, "Home care agencies and home care registries licensed under this chapter shall comply with applicable environmental, health, sanitation and professional licensure standards which are required by Federal, State and local authorities." 28 Pa. Code § 611.4

85.    Section 611.55 (a), Competency requirements, sets forth the minimum standards for training and hiring of direct care workers, before they are permitted to render services to any consumer.   The requirements include training on "handling of emergencies" and "recognizing and reporting abuse or neglect." 28 Pa. Code § 611.4 (b) (7), (9).

86.    Plaintiff's reports of illegal activity, sexual misconduct, and lack of responsiveness to address reported issues, all constituted reports of both abuse and neglect as defined under the Adult Protective Services Act, 35 Pa. C.S.A. § 10225.103.

87.    As set forth hereinabove, the Adult Protective Services Act also mandates reporting of abuse and neglect.

88.    The General Assembly declared the Commonwealth's policy in Section 102 of the Adult Protective Servies Act:

> (1) Adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment must have access to services necessary to protect their health, safety and welfare;
>
> . . .
>
> (5) The Commonwealth must provide for the detection, prevention, reduction and elimination of abuse, neglect, exploitation and abandonment and establish a program of protective services for adults in need of them.

35 P.S. § 10210.307(a)(1).

89.    Therefore, Defendants' termination of Plaintiff, being motivated to any degree by his reports of perceived abuse and neglect, constituted a clear violation of Commonwealth public policy.

90.     Mr. Boodoo reported that one of On-Site's staff members was engaging in a sexual relationship with a client to Dr. Pollock. Mr. Boodoo also reported that staff were engaging in illegal drug trades with a client.

91.     Defendants retaliated following Plaintiff's reports by issuing Mr. Boodoo a write-up and subsequently terminating his employment under false pretenses.

92.     Defendants' actions were intentional, willful, wanton, callous, and done in reckless indifferent to the rights of others.

93.      As a direct and proximate result of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in Plaintiff's favor and against Defendants, jointly and severally, including back pay, front pay, compensatory and punitive damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

**JURY TRIAL DEMANDED.**

Respectfully submitted,

**J.P. WARD & ASSOCIATES, LLC**

By: _____
    Joshua P. Ward, Esq. (Pa. I.D. 320347)

    J.P. Ward & Associates, LLC
    The Rubicon Building
    201 South Highland Avenue
    Suite 201
    Pittsburgh, PA 15206

    *Counsel for Plaintiff*