**IN THE UNITED STATED DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANDREW BOODOO,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No.: 2:24-cv-00451** |
| | : | |
| **ON-SITE COMPANIONSHIP** | : | |
| **SERVICES, INC.; and DR. DERRICK** | : | |
| **POLLOCK,** *jointly and severally*, | : | |
| | : | |
| **Defendants.** | | |

## THIRD AMENDED COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff, Andrew Boodoo, by and through the undersigned counsel, J.P. Ward & Associates, LLC, and, specifically, Joshua P. Ward, Esquire, who files the within Third Amended Complaint in Civil Action, against Defendants, On-Site Companionship Services, Inc. and Dr. Derrick Pollock, jointly and severally, and in support thereof states as follows:

## PARTIES

1.      Plaintiff, Andrew Boodoo (hereinafter "Mr. Boodoo"), is an adult individual who currently resides at 68 Marwood Avenue, Unit B, Pittsburgh, PA 15221.

2.      Defendant, On-Site Companionship Services, Inc. (hereinafter "On-Site"), is a domestic business corporation with a principal place of business at 429 4th Avenue, Pittsburgh, PA 15219.

3.      Defendant, Dr. Derrick Pollock (hereinafter "Dr. Pollock"), is an adult individual who upon information and belief, currently resides in Allegheny County.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper as Plaintiff brings this lawsuit under the False Claims Act ("FCA" – 31 U.S.C. §§ 3729 *et seq.*), Pennsylvania Adult Protective Services Act ("APSA" – 35 P.S. § 10210, *et. seq.*), Pennsylvania Whistleblower Law ("PWL" – 43 P.S. § 1421 *et seq.*) and Pennsylvania common law Wrongful Termination.

5.      Venue is proper pursuant to Pa.R.C.P. 2179(a)(2) because Defendant conducts business in Allegheny County, Pennsylvania.

6.      Mr. Boodoo is a resident and citizen of Pennsylvania and a substantial number of the events or omissions giving rise to the claims occurred in Western Pennsylvania. Therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 25 U.S.C. § 1391(b).

7.      Mr. Boodoo filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") regarding his allegations on or about March 25, 2024, under case number 533-2024-00954, respectively.

8.      On April 22, 2024, Mr. Boodoo requested his Notice of Right to Sue from the EEOC which was issued on April 24, 2024, for the aforementioned charges. The Complaint now timely follows.

## FACTUAL ALLEGATIONS

9.      Mr. Boodoo began his employment with Defendants on December 1, 2022, as a Site Supervisor.

10.     On-Site is a health care and social assistance service providing residential services for adults.   Their marketing materials on Linkedin.com states, in relevant part, "On-Site Companionship Services, Inc., (OCS) is a private for profit, community-based human services

2

agency serving the citizens and communities of Western Pennsylvania. Our agency was founded in 2018 in response to the Pennsylvania Mental Health and Mental Retardation Act of 1966."

11. Upon information and belief, On-Site is licensed as a home care agency.

12. Upon information and belief, On-Site has over 100 employees.

13. Upon information and belief, On-Site obtains its client referrals through the Pennsylvania Department of Human Services and The Office of Developmental Programs (ODP), which refers and manages cases for clients that have intellectual disabilities.

14. Upon information and belief, On-Site utilizes two pieces of software, "MITC" and "CREW", to manage timekeeping and billing submitted to the Centers for Medicare & Medicaid Services.

15. At all times relevant, Defendants continued to bill the United States for Medicaid and/or Medicare for its client services.

16. Mr. Boodoo's responsibilities as a Site Supervisor included, but were not limited to, assisting residents, fixing medications, and talking to therapists.

17. In March 2023, Mr. Boodoo was presented with an award for Employee of the Month in recognition for his dedication, passion, and hard work.

18. On or about April or May 2023, there was an internal dispute in Defendants' company and the personnel structure changed.

   a. **Mr. Boodoo Reports Sexual Wrongdoing on behalf of Defendants' Employees.**

19. On or around July 2023, Mr. Boodoo made a complaint to Human Resource Representative, Alexis Sherwood (hereinafter "Ms. Sherwood"), that she kept making scheduling errors.

20.    Following his complaint, Ms. Sherwood began decreasing the number of hours that Mr. Boodoo scheduled for each week.

21.    Subsequently, Mr. Boodoo notified the owner, Dr. Pollock, that Ms. Sherwood was decreasing his hours and making errors regarding payroll, however, Dr. Pollock did not take action to rectify the situation.

22.    Around the same time, Mr. Boodoo reported to Mr. Pollock that one of his coworkers, Sam Blair (hereinafter "Mr. Blair"), was having a sexual relationship with one of the adult clients that had intellectual disabilities, including, autism, mood disorders, and intermittent explosive disorder.   This client was referred through ODP and had a monthly Individual Support Plan (hereinafter "ISP"),

23.    Upon information and belief, Defendants never took any corrective action against Mr. Blair. In fact, Defendants increased Mr. Blair's hours from two days per week to five days per week following Mr. Boodoo's report.

b.  **Mr. Boodoo's Reports about Staff Selling Drugs to Clients.**

24.    On August 28, 2023, Mr. Boodoo was working an overnight shift taking care of a client, M.L. (full name not given for confidentiality purposes), who has his own apartment.

25.    M.L. was allowed up to four (4) hours of alone time as part of his Individual Support Plan (hereinafter "ISP"), which is a plan that details what is most important to the care of an individual with an intellectual disability. Therefore, it was common practice for Defendants' staff to leave the house when M.L. requested alone time.

26.    M.L. frequently had members of On-Site's staff sell or buy drugs from him.

27.    Around 12:00 am, M.L. asked Mr. Boodoo to roll a marijuana joint for him to smoke, or alternatively to acquire marijuana from other employees. However, Mr. Boodoo refused.

4

28.     Thereafter, M.L. became very agitated and requested alone time.

29.     Acting in accordance with B.'s ISP and On-Site's practices, Mr. Boodoo left M.L.'s home and called the On-Call Manager, Jamar Jackson (hereinafter "Mr. Jackson"), to inform him.

30.     However, Mr. Jackson did not answer his phone and Mr. Boodoo was forced to leave two voicemails.

31.     Mr. Jackson did not call Mr. Boodoo back until 3:00 am, at which point Mr. Boodoo informed him that he was changing his clothes and would return to M.L.'s house well within the allotted four hours.

32.     However, when Mr. Boodoo was returning to M.L.'s home, he passed Mr. Jackson, who had just left the residence. When he attempted to enter the residence, he found that the front door was locked and that he could not enter because he did not have a key.

33.     Mr. Boodoo once again attempted to call Mr. Jackson, who never answered, and Mr. Boodoo was unable to gain entrance for the remainder of his shift. Upon information and belief, Mr. Jackson purposefully locked Mr. Boodoo out of the residence.

34.     A couple of days later, Mr. Boodoo received an email from Ms. Sherwood, who informed him that he was being written up for abandoning M.L. on August 28, 2023, without contacting Defendants. The email also stated that Defendants have a "zero tolerance policy" for leaving clients unattended.

35.     In response, Mr. Boodoo stated that M.L. requested alone time after Mr. Boodoo refused to roll his drugs for him or contact any other staff to pick up drugs for him. Mr. Boodoo also stated that it is unacceptable for Defendants to knowingly allow this situation to occur, especially when M.L. did not have his medical marijuana license.

36.     Mr. Boodoo also reported that he was being treated differently as Defendants were picking and choosing what specific incidents to discipline staff for, while ignoring Mr. Boodoo's reports of illegal activity and violations of state policies.

37.     Further, Mr. Boodoo complained that when he contacts Defendants they do not always respond in a timely manner.

38.     Therefore, Mr. Boodoo refused to sign or accept the write-up.

39.     Importantly, although Mr. Boodoo had made complaints about Defendants' staff engaging in illegal drug behavior specifically with M.L., Defendants did not take any corrective against M.L.  or the offending staff.

40.     Instead, Dr. Pollock reached out to Mr. Boodoo to set up a meeting to discuss the write-up. Dr. Pollock informed Mr. Boodoo that he would be the one taking care of the matter and working towards a resolution. However, during the meeting, Mr. Boodoo once again explained the situation to Dr. Pollock and stated that he believed he would be neglecting M.L. if he had not acted in accordance with the ISP. However, Dr. Pollock stated that he would not be retracting the write-up.

### c.  Mr. Boodoo's Reports to Outside Agencies Regarding Abuse and Neglect.

41.     Prior to his termination, Mr. Boodoo made multiple calls to mandated hotlines to report instances of abuse and neglect occurring at various houses managed by Defendants.

42.     Upon information and belief, one of the agencies contacted by Mr. Boodoo was the Pennsylvania Department of Aging (PDA).

43.     Specifically, Mr. Boodoo contacted the Pennsylvania Department of Human Services (DHS) and several other agencies.

44.     Mr. Boodoo recalls calling multiple numbers, likely all connected to various departments within Commonwealth, to report these issues.

45.     He received voicemails requesting follow-up information regarding his reports.

46.     During his first call to DHS, Mr. Boodoo reported abuse involving several clients. He also highlighted a risk of abuse and neglect linked to a purported $1.4 million embezzlement issue within the management, which he believed was jeopardizing client safety.

47.     Mr. Boodoo retains his call logs, which can verify the dates and times of these calls.

48.     Additionally, Mr. Boodoo shared this information with his on-call supervisor, Rolland Askerneese (hereinafter "Mr. Askerneese"). He informed Mr. Askerneese about the numerous allegations of abuse and neglect he had reported.

49.     In response, Mr. Askerneese listened to Mr. Boodoo's concerns but did not provide substantive feedback or take any known action.

50.     Upon information and belief, Mr. Boodoo's discipline in termination was as a direct result of his external reports concerning abuse and neglect.

### d.   Mr. Boodoo's Internal Reports of Sexual Harassment or Quid Pro Quo Abuse by a Supervisor.

51.     During the same meeting, Mr. Boodoo reported to Dr. Pollock that Mr. Jackson had initiated sexual relationships with some of the female employees and had sent a picture of his genitalia to one of the female employees.

52.     Mr. Boodoo was told by other employees that the illicit photographs were not welcomed or well received by the female employees, and they had voiced their concerns to co-workers.

53. When describing Mr. Jackson's conduct at work, female employees stated that Mr. Jackson "hits on everything."

54. Mr. Boodoo was concerned that Mr. Jackson was abusing his position in a quid pro quo manner of harassment toward female employees.

55. Upon information and belief, Dr. Pollock took notes regarding Mr. Boodoo's report, but failed to take any corrective action towards Mr. Jackson.

      **e.**   **Defendants' Retaliation Against Mr. Boodoo.**

56. On September 23, 2023, Mr. Boodoo relieved his coworker, Tristan Pierce (hereinafter "Mr. Pierce"), in order to start his overnight shift at a client's house from 11:00pm to 7:00am.

57. Mr. Boodoo worked the entirety of his shift at the client's house, clocking in at 10:38pm and clocking out at 8:00am.

58. On September 26, 2023, the Head of Human Resources, Amaris Andrade (hereinafter "Ms. Andrade"), emailed Mr. Boodoo to inform him that his employment was being terminated. Dr. Pollock was copied on the email.

59. The email alleged that Mr. Boodoo was not present at the worksite for the entirety of his shift on September 23, 2023, and that Mr. Boodoo left a client unattended for an extended period.

60. The email alleged that Mr. Boodoo was not seen on any of the surveillance cameras at the worksite. However, upon information and belief, the surveillance cameras at the worksite in question were not operational on the day of September 23, 2023.

61. Additionally, the email cited Mr. Boodoo's previous write-up and claimed this was the second time that he had left a client unattended despite Mr. Boodoo's repeated explanations

that he was acting in accordance with the client's ISP and reporting illegal activity by the client and staff.

62.     On-Site had paid Mr. Boodoo for working a full eight-hour shift on September 23, 2023.  Therefore, upon information and belief, Dr. Pollock fabricated the allegations that Mr. Boodoo had left a client unattended and terminated his employment in retaliation for his multiple reports of fraudulent billing, illegal conduct, and sexual misconduct, abuse and neglect, by Defendants, their staff, and their client.

## PARTICIPATION THEORY
*Plaintiff v. Defendants, both jointly and severally*
*(Pled in Connection with All Counts)*

63.     The Courts of this Commonwealth have long recognized the "participation theory", whereby, a corporate officer who participates in wrongful, injury-producing conduct can be personally liable, that is, individually liable for torts committed while acting within the scope of his or her employment by the corporation.  *Loeffler v. McShane*, 539 A.2d 876 (Pa. Super. 1988); *Moy v. Schreiber Deed Sec. Co.,* 535 A.2d 1186 (Pa. Super. 1988); *Amabile v. Auto Kleen Car Wash*, 376 A.2d 247 (Pa. Super. 1977); *Tayar v. Camelback Corp. Inc.*, 957 A.2d 281 (Pa. Super. 2008).

64.     Moreover, the fact that a corporation may be vicariously or secondarily liable under the doctrine of respondeat superior does not relieve the individual of his or her responsibility.  An action against such individual may exist even though the agent or officer derived no personal benefit, but acted on behalf of, and in the name of, the corporation and the corporation alone was enriched by the act.  *Shonberger v. Oswell*, 530 A.2d 112 (Pa. Super. 1987); *Kaites v. Com. of Pa. Dept. of Environmental Resources*, 529 A.2d 1148 (Pa. Commw. 1987).

65.     There is a distinction between liability for individual participation in a wrongful act and an individual's responsibility for any liability-creating act performed behind the veil of a sham corporation; when the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity and therefore its acts are truly the owner's, while under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. *Shay v. Flight C Helicopter Services, Inc.*, 822 A.2d 1 (Pa. Super. 2003).

66.     Defendant Dr. Pollock is the owner of Defendant corporation.

67.     Dr. Pollock retaliated against and terminated Mr. Boodoo following his multiple complaints regarding illegal conduct and sexual misconduct by Defendants, their staff, and their clients in the workplace.

## COUNT I
### WRONGFUL TERMINATION
### IN VIOLATION OF THE ADULT PROTECTIVE SERVICES ACT
*(Plaintiff v. all Defendants, jointly and severally)*

68.     Mr. Boodoo incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

69.     In 2010, the Adult Protective Services Act (hereinafter "APSA") was enacted to protect adults between the ages of 18 and 59 with a physical or mental disability that limits one or more major life activities. The APSA establishes a program of protective services under the DHS in order to detect, prevent, reduce, and eliminate abuse, neglect, exploitation, and abandonment of these adults in need. Pa. Stat. Ann. tit. 35, § 10210.101 (West).

70.     It is declared the policy of this Commonwealth that:

> (1) Adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment must

have access to services necessary to protect their health, safety and welfare.
. . .
(4) Information about protective services should be provided in a safe place and in a safe, understandable and responsive manner.

(5) The Commonwealth must provide for the detection, prevention, reduction and elimination of abuse, neglect, exploitation and abandonment and establish a program of protective services for adults in need of them.

Pa. C.S. 35 § 10210.102 (West).

71.     Section 10210.501, Reporting by employees, subsection (a)(1), states that "An employee or an administrator who has reasonable cause to suspect that a recipient is a victim of abuse or neglect shall immediately make an oral report to an agency. If applicable, the agency shall advise the employee or administrator of additional reporting requirements that may pertain under subsection (b). An employee shall notify the administrator immediately following the report to the agency." *Id*.

72.     The APSA functions as a direct extension of the PWL, as stated in its whistleblower provision, "A person required under this act to report a case of suspected abuse or neglect shall not be subject to any retaliatory action for reporting suspected abuse or neglect and shall have the protections and remedies set forth in the act of December 12, 1986 (P.L.1559, No.169), known as the Whistleblower Law." 35 P.S. § 10210.506.

73.     The APSA defines abuse as "the willful deprivation by a caregiver of goods or services which are necessary to maintain physical or mental health."  35 P.S. § 10210.103.

74.     The APSA defines neglect as "the failure to provide for oneself or the failure of a caregiver to provide goods, care or services essential to avoid a clear and serious threat to the physical or mental health of an adult." *Id.*

75.     The APSA defines agency as "a local contracted provider of protective services." *Id.*

76.     Under the APSA, Plaintiff had an affirmative duty to report the abuse and neglect of an adult client in need to the appropriate authorities.  35 P.S. § 10210.501.

77.     Further, pursuant to Section 10210.302(a), "A person having reasonable cause to believe that an adult is in need of protective services may report such information to the agency."

78.     Section 302 expressly prohibits retaliation and intimidation against persons who make reports of suspected abuse and neglect. The Act contains provisions providing for a civil cause of action against persons who engage in retaliation and intimidation against reporters.

79.     Pursuant to Section 302, Reporting:

(d) Retaliatory action.-

> (1) Any person who makes a report or cooperates with the agency, including providing testimony in any administrative or judicial proceeding, and any adult in need of protective services shall not be subject to any discriminatory, retaliatory or disciplinary action by an employer or by any other person or entity.

> (2) Any person who violates this subsection is subject to a civil action by the reporter or the adult in need of protective services, in which action the reporter or adult in need of protective services shall recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater.

(e) Intimidation.-

> (1) A person, including an adult in need of protective services, with knowledge sufficient to justify making a report or cooperating with an agency, including possibly providing testimony in an administrative or judicial proceeding, shall not be subject to any intimidation by an employer or by any other person or entity.

> (2) A person who violates this subsection is subject to civil action by the reporter or the adult in need of protective services, in which action the reporter or adult in need of protective services shall

recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater.

35 P.S. § 10210.302.

80.     Mr. Boodoo reported to an external agency, the Pennsylvania Department of Human Services, that one of On-Site's staff members was engaging in a sexual relationship with a client, engaging in and permitting drug use, and other risks of abuse and neglect. The sexual relationship amounted to abuse, as defined by the APSA.

81.     Mr. Boodoo also reported illegal drug use by one of Defendants' clients, as well as that Defendants' staff would sell, buy, and provide illegal drugs to Defendants' client and they were knowingly ignoring the problem.

82.     The Pennsylvania Department of Human Services is an agency as defined by the ASPA.

83.     Mr. Boodoo shared with his on-call supervisor, Rolland Askerneese, that he had reported the aforementioned misconduct to an outside agency.

84.     Upon information and belief, Mr. Askerneese informed Defendants that Mr. Boodoo had reported allegations of abuse and neglect to an outside agency.

85.     Upon information and belief, Mr. Boodoo's discipline and termination was as a direct result of his external reports concerning abuse and neglect.

86.     Defendants retaliated against Mr. Boodoo by issuing a write-up and subsequently terminating his employment under false pretenses.

87.     Defendants' actions were intentional, willful, wanton, callous, and done in reckless indifference to the rights of others.

88.      As a direct and proximate result of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional

opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in Plaintiff's favor and against Defendants, jointly and severally, including back pay, front pay, compensatory and punitive damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

<u>**COUNT II**</u>
**WRONGFUL TERMINATION**
**IN VIOLATION OF THE OLDER ADULT PROTECTIVE SERVICES ACT**
*(Plaintiff v. all Defendants, jointly and severally)*

100.    Mr. Boodoo incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

101.    In 1987, the Older Adult Protective Services Act (hereinafter "OAPSA") was enacted to protect older adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment. The OAPSA establishes a program of protective services in order to detect, prevent, reduce, and eliminate abuse, neglect, exploitation, and abandonment of these adults in need. Pa. Stat. Ann. tit. 35, § 10225.101 (West).

102.    It is declared the policy of this Commonwealth that:

> Older adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment shall have access to and be provided with services necessary to protect their health, safety and welfare. It is not the purpose of this act to place restrictions upon the personal liberty of incapacitated older adults, but this act should be liberally construed to assure the availability of protective services to all older adults in need of them. Such services shall safeguard the rights of incapacitated older

> adults while protecting them from abuse, neglect,
> exploitation and abandonment.

Pa. C.S. 35 § 10225.102 (West).

103.    Section 10225.701, Reporting by employees, subsection (a)(1), states that "An employee or an administrator who has reasonable cause to suspect that a recipient is a victim of abuse shall immediately make an oral report to the agency. If applicable, the agency shall advise the employee or administrator of additional reporting requirements that may pertain under subsection (b). An employee shall notify the administrator immediately following the report to the agency." *Id.*

104.    The OAPSA defines abuse as "the willful deprivation by a caregiver of goods or services which are necessary to maintain physical or mental health."  35 P.S. § 10225.103.

105.    The OAPSA defines neglect as "the failure to provide for oneself or the failure of a caregiver to provide goods or services essential to avoid a clear and serious threat to physical or mental health." *Id.*

106.    The OAPSA defines agency as "The local provider of protective services, which is the area agency on aging or the agency designated by the area agency on aging to provide protective services in the area agency's planning and service area." *Id.*

107.    Under the OAPSA, Plaintiff had an affirmative duty to report the abuse and neglect of an older adult client in need to the appropriate authorities.  35 P.S. § 10225.701.

108.    Further, pursuant to Section 10225.302(a), "Any person having reasonable cause to believe that an older adult is in need of protective services may report such information to the agency which is the local provider of protective services."

109.    Section 302 expressly prohibits retaliation and intimidation against persons who make reports of suspected abuse and neglect. The Act contains provisions providing for a civil cause of action against persons who engage in retaliation and intimidation against reporters.

110.    Pursuant to Section 302, Reporting; protection from retaliation; immunity:

(c) Retaliatory action; penalty.—

> Any person making a report or cooperating with the agency, including providing testimony in any administrative or judicial proceeding, and the victim shall be free from any discriminatory, retaliatory or disciplinary action by an employer or by any other person or entity. Any person who violates this subsection is subject to a civil lawsuit by the reporter or the victim wherein the reporter or victim shall recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater.

(c.1) Intimidation; penalty.—

> Any person, including the victim, with knowledge sufficient to justify making a report or cooperating with the agency, including possibly providing testimony in any administrative or judicial proceeding, shall be free from any intimidation by an employer or by any other person or entity. Any person who violates this subsection is subject to civil lawsuit by the person intimidated or the victim wherein the person intimidated or the victim shall recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater.

35 P.S. § 10225.302

89.     Additionally, pursuant to Section 10225.704(a), "Upon notification that an employee is alleged to have committed abuse, the facility shall immediately implement a plan of supervision or, where appropriate, suspension of the employee, subject to approval by the agency and by the Commonwealth agency with regulatory authority over the facility."

90.     Upon information and belief, Mr. Boodoo reported to the Pennsylvania Department of Aging that one of On-Site's staff members was engaging in a sexual relationship with a client. The sexual relationship amounted to abuse, as defined by the OAPSA.

91.     Mr. Boodoo also reported illegal drug use by one of Defendants' clients, as well as that Defendants' staff would sell, buy, and provide illegal drugs to Defendants' client and they were knowingly ignoring the problem.

92.     Mr. Boodoo shared with his on-call supervisor, Rolland Askerneese, that he had reported the aforementioned misconduct to an outside agency.

93.     Upon information and belief, Mr. Askerneese informed Defendants that Mr. Boodoo had reported allegations of abuse and neglect to an outside agency.

94.     Upon information and belief, Mr. Boodoo's discipline and termination was as a direct result of his external reports concerning abuse and neglect.

95.     Defendants retaliated against Mr. Boodoo by issuing a write-up and subsequently terminating his employment under false pretenses.

96.     Defendants took no actions to implement a plan of supervision for any of its employees alleged to have committed abuse.

97.     Defendants' actions were intentional, willful, wanton, callous, and done in reckless indifference to the rights of others.

98.      As a direct and proximate result of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in Plaintiff's favor and against Defendants, jointly and severally, including back pay, front pay, compensatory and punitive damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

<u>**COUNT III**</u>
**RETALIATORY TERMINATION**
**IN VIOLATION OF THE PWL**
*(Plaintiff v. all Defendants, jointly and severally)*

174.    Mr. Boodoo incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

175.    Pursuant to the Whistleblower Law, no employer may discharge, threaten or otherwise discriminate or retaliate against an employee because the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste. 43 P.S. § 1423(a).

176.    A person who alleges a violation of this act may bring a civil action for appropriate injunctive relief or damages, or both, within 180 days after the occurrence of the alleged violation. 43 P.S. § 1424(a).

177.    An employee alleging a violation of this act must show by a preponderance of the evidence that, prior to the alleged reprisal, the employee reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer. 43 P.S. § 1424(b).

178.    The Pennsylvania Whistleblower Law is "chiefly a remedial measure intended to enhance openness in government and compel the government's compliance with the law by protecting those who inform authorities of wrongdoing." *Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A. 3d 465, 475 (Pa. Super. 2017).

179.    Under the PWL, 43 Pa. Stat. §§1421-1428, a "whistleblower" is "a person who witnesses of has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority." *Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300, 307 (Pa. 2015) (citing 43 P.S. §1422).

180.    Under 43 P.S. §1423(b), "the reported wrongdoing must either be that of the employer or a violation of a law or code of conduct that the employer is charged to enforce for the good of the public." *Sea v. Seif*, 831 A.2d 1288, 1292 (Pa. Commw. Ct. 2003).

181.    The PWL defines an appropriate authority as "a federal, state, or local government body, agency, or organization having jurisdiction over criminal law enforcement, regulatory violations, professional conduct or ethics, or waste; or a member, officer, agent, representative or supervisory employee of the body, agency, or organization." 43 P.S. §1422.

182.    Under the PWL, an employer is "a public body" if it "receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body: an individual, a partnership, an association, a corporation for profit, or a corporation not for profit." 43 P.S. §1422.

183.    On-Site services receives the majority of its revenue from state and federal funding available for care facilities dedicated to providing habilitation and psychiatric care to care dependent persons with intellectual disabilities.

184.    Mr. Boodoo reported to Dr. Pollock that one of On-Site's staff members was engaging in a sexual relationship with a client. The sexual relationship amounted to abuse, as defined by the APSA.

185.    Mr. Boodoo also reported illegal drug use by one of Defendants' clients, as well as that Defendants' staff would sell, buy, and provide illegal drugs to Defendants' client and they were knowingly ignoring the problem.

186.    Mr. Boodoo also reported the allegations of waste, abuse and neglect to the Pennsylvania Department of Human Services.

187.    Defendants retaliated against Mr. Boodoo by issuing a write-up and subsequently terminating his employment under false pretenses.

188.    Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

189.    As a direct and proximate cause of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present, and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in Plaintiff's favor and against Defendants, jointly and severally, including back pay, front pay, compensatory damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

## COUNT IV
### Common Law Wrongful Termination - Violation of a Clear Mandates of Commonwealth Public Policy Rated to Safety Complaints
*(Plaintiff v. all Defendants, jointly and severally)*

115.    In the Commonwealth of Pennsylvania, "as a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship." *Mikhail v. Pennsylvania Org. for Women in Early Recovery,* 63 A.3d 313, 316 (Pa. Super. 2013).

116.    However, an at-will employee "will be entitled to bring a cause of action for a termination of that relationship . . . where the termination implicates a clear mandate of public policy in the Commonwealth of Pennsylvania." *McLaughlin v. Gastrointestinal Specialists, Inc.,* 750 A.2d 283, 287 (Pa. 2000).

117.    Pennsylvania courts define public policy "by reference to the laws and legal precedents and not from supposed public interest." *Id.* at 288.

118.    It is well established that an employee that makes safety concerns in the workplace, and particularly when in a medical setting complaints are made internally and externally regarding abuse and neglect, can set forth a claim for wrongful termination.  *See e.g. Tanay v. Encore Healthcare, LLC*, 810 F. Supp. 2d 734, 738–39 (E.D. Pa. 2011); *Wetherhold v. Radioshack Corp.,* 339 F. Supp. 2d 670, 682 (E.D. Pa. 2004).

**A. Plaintiff's termination violates the public policy found in the Health Care Facilities Act, 35 Pa. Stat. § 448.101 et seq., as implemented by 28 Pa.Code § 611.1 et seq.**

119.    The Health Care Facilities Act, 35 Pa. Stat. § 448.101 et seq., as implemented by 28 Pa.Code § 611.1 et seq., sets forth the licensing requirements and minimum competency standards for Home Care Agencies and Home Care Registries.

120.    Defendant is licensed as a Home Care Agency, pursuant to 28 Pa. Code § 611.2 (c).

121.    The purpose of this Home Care Agency code is to "to protect and promote the public health and welfare through the establishment and enforcement of regulations setting minimum standards for the operation of home care agencies and home care registries. The standards are intended by the Department to assure safe, adequate and efficient home care agencies and home care registries, and to promote the health, safety and adequate care of the consumers of services provided by home care agencies and home care registries." 28 Pa. Code § 611.1 (c).

122.    Pursuant to Section 611.3 (b), Defendant must comply with the minimum standards, requirements, and public policy concerns set forth in the entirety of 28 Pa. Code § 601.1 et seq.

123.    Further, "Home care agencies and home care registries licensed under this chapter shall comply with applicable environmental, health, sanitation and professional licensure standards which are required by Federal, State and local authorities." 28 Pa. Code § 611.4

124.    Section 611.55 (a), Competency requirements, sets forth the minimum standards for training and hiring of direct care workers, before they are permitted to render services to any consumer.   The requirements include training on "handling of emergencies" and "recognizing and reporting abuse or neglect." 28 Pa. Code § 611.4 (b) (7), (9).

125.    Plaintiff's reports of illegal activity, sexual misconduct, and lack of responsiveness to address reported issues, all constituted reports of both abuse and neglect under the Health Care Facilities Act 35 Pa. Stat. § 448.101 et seq., as implemented by 28 Pa. Code § 611.1 et seq.

126.    Pennsylvania has laws in place to address and criminalize sexual misconduct involving healthcare workers and individuals with intellectual disabilities. Below are a summary of some key statutes which criminalize or otherwise mandate reporting of sexual activity with those with intellectual disabilities under the circumstances presented:

   a. **Institutional Sexual Assault (18 Pa.C.S. § 3124.2):** This statute makes it a crime for an employee or agent of a facility to engage in sexual intercourse, deviate sexual intercourse, or indecent contact with a person who is a patient or resident of the facility and who is receiving treatment or care. This includes individuals with intellectual disabilities in healthcare settings.

   b. **Abuse of Care-Dependent Person (18 Pa.C.S. § 2713):** This statute makes it a crime to abuse, neglect, or exploit a care-dependent person, which can include sexual abuse. A "care-dependent person" includes individuals with intellectual disabilities who rely on caregivers for assistance.

   c. **Protection of Persons in Facilities under the Older Adult Protective Services Act (35 P.S. § 10225.101 et seq.):** This series of statutes provides protections for individuals with intellectual disabilities and other vulnerable populations in facilities. It mandates reporting and addresses abuse, including sexual misconduct, within care facilities.  Specifically, § 10225.701(a)(1), states that "[a]n employee or an administrator who has reasonable cause to suspect that a recipient is a victim of abuse shall immediately make an oral report to the agency."   Adults with intellectual disabilities qualify as a ""Care-dependent individual" defined as "[a]n adult who, due to physical or cognitive disability or impairment, requires assistance to meet needs for food, shelter, clothing, personal care or health care."35 Pa. Stat. Ann. § 10225.701.

d. **Adult Protective Services Act (35 P.S. § 10225.101 et seq.):** The Adult Protective Services (APSA) Act in Pennsylvania is designed to protect adults with disabilities and older adults from abuse, neglect, exploitation, and abandonment. Key points include: The APS Act applies to adults aged 18-59 with physical or intellectual disabilities and adults aged 60 and older who lack the capacity to protect themselves. The Act mandates the reporting of suspected abuse, neglect, exploitation, or abandonment. Healthcare workers, social workers, and other professionals are required to report if they suspect such abuse.

127.     Therefore, Defendants' termination of Plaintiff, being motivated to any degree by his reports of perceived abuse and neglect, constituted a clear violation of Commonwealth public policy.

128.     Mr. Boodoo was required to report said abuse and neglect both internally and externally to avoid potential criminal and civil penalties.

129.     Correspondingly, as a licensed facility, caretaker, and care home, On-Site can potentially face criminal and civil penalties for interfering with Mr. Boodoo's attempts to report and rectify these instances of abuse and neglect.

130.     Mr. Boodoo reported to Dr. Pollock that one of On-Site's staff members was engaging in a sexual relationship with a client. Mr. Boodoo also reported that staff were engaging in illegal drug trades with a client.

131.     Defendants retaliated following Plaintiff's reports by issuing Mr. Boodoo a write-up and subsequently terminating his employment under false pretenses.

132.     Mr. Boodoo's disciplinary write-ups and termination prevented him from complying with a statutory duty to report abuse and neglect.

133.     Defendants' actions were intentional, willful, wanton, callous, and done in reckless indifference to the rights of others.

134.     As a direct and proximate result of the aforementioned conduct, Plaintiff suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional

opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in Plaintiff's favor and against Defendants, jointly and severally, including back pay, front pay, compensatory and punitive damages, costs, in addition to any such relief as deemed just and proper.

## COUNT V
## RETALIATION IN VIOLATION OF
## TITLE VII AND THE PHRA
*Plaintiff v. Defendants, both jointly and severally*
*(Pled in Connection with All Counts)*

135.    Mr. Boodoo incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

136.    To establish a prima facie case of retaliation under Title VII, a plaintiff must provide evidence that: (1) he "engaged in activity protected by Title VII"; (2) the employer took an "adverse employment action" against him; and (3) there was a "causal connection" between his "participation in the protected activity and the adverse employment action." *Kengerski v. Allegheny Cty.*, 435 F. Supp. 3d 671, 676 (W.D. Pa. 2020) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006)).

137.    Under Title VII, a plaintiff does not need to prove that the reported conduct was unlawful, as long as plaintiff had a "reasonable belief" that the conduct being reported constitutes unlawful discrimination. *Trent v. Valley Elec. Ass'n, Inc.*, 41 F.3d 524, 526 (9th Cir. 1994) (citing *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978)).

138.    Under Title VII's antiretaliation provision, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, 'which in this context means

24

it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (quoting *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)).

139.     The analytical framework used to evaluate a claim under the PHRA is effectively indistinguishable from that under Title VII. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999).

140.     Mr. Boodoo reported Mr. Jackson's sexual harassment of On-Site's female employees to Dr. Pollock. This constituted protected activity.

141.     Mr. Boodoo had a good faith reasonable belief that Mr. Jackson's conduct was a violation of Title VII.

142.     Defendants failed to take corrective action against Mr. Jackson.

143.     On September 26, 2023, following Mr. Boodoo's report of sexual misconduct among Defendants' staff, Mr. Boodoo was terminated.

144.     Defendants' purported reasoning for termination included fabricated allegations that Mr. Boodoo had left a client unattended, and a reference to the previous pretextual write-up alleging the same.

145.     These retaliatory actions are temporally close to Mr. Boodoo's reports and therefore create an inference of retaliation following his protected activity.

146.     Disciplinary write-ups and termination are materially adverse employment actions that would dissuade a reasonable worker from engaging in protected activity.

147.     Defendants' actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

148.    As a direct and proximate cause of the aforementioned conduct, Mr. Boodoo suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present, and future.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in his favor and against Defendants, jointly and severally, including back pay, front pay, compensatory and punitive damages, costs and reasonable attorneys' fees, in addition to any such relief as deemed just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

**J.P. WARD & ASSOCIATES, LLC**

July 30, 2024                                  By: _____
                                                    Joshua P. Ward, Esq. (Pa. I.D. 320347)

J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

*Counsel for Plaintiff*